ALASKA LUMBER & PULP COMPANY, INC., Appellant,

v.

Edward R. MADIGAN, Secretary of Agriculture, Appellee.

No. 92–1100.

United States Court of Appeals, Federal Circuit.

Aug. 3, 1993.

Rehearing Denied Oct. 15, 1993.

Alan I. Saltman, Saltman & Stevens, P.C., Washington, DC, argued for appellant. With him on the brief were Ruth G. Tiger and Vincent S. Antonacci. Of counsel was Keven R. Garden.

Joan M. Bernott, Sp. Litigation Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief was Robert Maynard, Office of General Counsel, Dept. of Agr., Juneau, AK, of counsel.

Before NEWMAN, MAYER, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Alaska Lumber & Pulp Co. (ALP) appeals from the March 29, 1991 decision of the Department of Agriculture Board of Contract Appeals, *Alaska Lumber & Pulp Co.*, AGBCA Nos. 83–301–1, 84–351–1, 91–2 B.C.A. (CCH) ¶ 23,890, 1991 WL 49978 (Mar. 29, 1991), reconsideration denied, 91–3 B.C.A. (CCH) ¶ 24,269, 1991 WL 159866 (AGBCA Aug. 14, 1991). The Board denied ALP's claim for $5,613,122.22, which it had earlier paid to the United States Forest Service as reimbursement for road construction credits it had applied toward the purchase of timber. We affirm-in-part and reverse-in-part.

## BACKGROUND

On January 25, 1956, ALP entered into a contract with the Forest Service for the purchase of an estimated volume of 4,974,700 thousand board feet (MBF) of timber from the Tongass National Forest in Alaska over a term of fifty years. Under the contract, ALP was required to build roads necessary for timber removal and pay specified rates ("stumpage rates") for the timber it removed. After an initial period ending June 30, 1971, the contract divided performance into five-year operating periods and provided that the Forest Service would redetermine stumpage rates at the beginning of each period. Section 5b. In addition to the rate redeterminations scheduled every five years, section 2e of the contract permitted ALP to apply for a

rate redetermination during any current operating period, based on adverse economic conditions. In setting stumpage rates, the Forest Service accounted for the estimated costs of road construction. Section 2d–2. The contract precluded the setting of stumpage rates below specified base rates and required ALP to pay base rates in cash. Sections 2b–2, 2d–5.

The parties modified the contract in 1975 and again in 1979 to include a "purchaser credit" system to enable ALP to earn credits based on the cost of road construction and apply those credits toward the purchase of timber. Sections 2g and 4c. These modifications enabled ALP to apply the road construction credits under both the contract at issue and other timber sale contracts in the Tongass.[1] This system benefitted companies like ALP by permitting them to immediately recoup their road construction costs. Under the modified contract, the Forest Service set higher stumpage rates, since it no longer factored estimated road construction costs into the determination of stumpage rates.

The purchaser credit modifications continued to expressly limit ALP's use of credits to the above-base-rate portion of the stumpage rate and thus precluded the use of credits to offset base rates. Sections 2g–4 and 4c–3. The modifications also provided that ALP was required to reimburse the Forest Service for any purchaser credits that it transferred to other contracts in the Tongass when the credits were subsequently rendered ineffective. Section 4c–2.

This case involves the 1981–1985 operating period. At the beginning of that period, the Forest Service set stumpage rates at $86.29/MBF and base rates at $1.48/MBF. On June 22, 1982, ALP requested a rate redetermination pursuant to section 2e of the contract, asserting the existence of adverse economic conditions. On May 6, 1983, the For-

est Service granted ALP's request and reduced the stumpage rate from $86.29/MBF to the base rate of $1.48/MBF. The effective date of the reduced rates was retroactive to July 1, 1982.

Upon granting ALP's request, the Forest Service billed ALP for $6,021,274.00 plus interest, subsequently reduced to $5,613,122.22 for reasons not here relevant. ALP had used that amount of purchaser credit toward timber purchases under other contracts in the Tongass since January 1, 1981, the beginning of the operating period. According to the Forest Service, following the rate redetermination which reduced rates to base, the purchaser credits that ALP had previously used during that operating period were rendered ineffective and ALP was thus required to reimburse the Forest Service with cash. ALP paid the amount billed and filed a claim for recoupment with the contracting officer (CO). The CO denied ALP's claim and ALP appealed to the Board.

A three-member panel of the Board agreed that ALP's claim should be denied, but it was unable to agree on a rationale. Consequently, the Board issued three separate opinions. The Board unanimously found that under the contract ALP was (1) obligated to construct roads necessary for timber removal, (2) required to pay cash for base stumpage rates, (3) precluded from using purchaser credit to offset base rates, and (4) required to reimburse the Forest Service for previously used purchaser credits rendered ineffective by the rate redetermination.

Administrative Judges Houry and Doherty essentially agreed that ALP's claim should be denied on the ground that, after the stumpage rate was reduced to the base rate following the rate redetermination, there was no margin above base against which ALP could apply its credits. Administrative Judge Eaton concurred, stating that she

---

1. The statutory and regulatory basis for the purchaser credit system arose in 1964, when Congress enacted legislation authorizing the Forest Service to permit amortization of national forest road construction costs in timber sale contracts. Pub.L. No. 88–657, § 4, 78 Stat. 1089 (1964) (currently codified as amended at 16 U.S.C. § 535 (1988)). In 1975, Congress amended the purchaser credit legislation to allow purchasers to transfer credit earned for road construction under one timber sale contract to pay for timber harvested under another contract in the same national forest. Pub.L. No. 94–154, 89 Stat. 823 (1975) (codified at 16 U.S.C. § 535 (1988)). In accordance with the statute, the Forest Service issued regulations implementing the "purchaser credit" system. 36 C.F.R. § 223.62 (1991).

would have rescinded the contract modifications implementing the purchaser credit system and remanded the case for the parties to recalculate stumpage rates as provided under the pre-modification contract which included estimated road construction costs.

## DISCUSSION

■ The issue before us is whether, following the rate redetermination, ALP was required to reimburse the Forest Service for purchaser credits it had previously used toward the purchase of timber under its other contracts in the Tongass. The case turns on the proper application of section 4c–2, which provides:

Effective Purchaser Credit transferred from this contract subsequently determined to be ineffective under terms of this contract shall be replaced by cash payments....

The contractual prohibition against the use of credits toward the payment of base rates as set forth in section 4c–3 is also pertinent; it provides in pertinent part: "Transferred Purchaser credit may not be used to cover payments for Base Rates...."

ALP essentially argues that the Board incorrectly interpreted these provisions and that it was not required to reimburse the Forest Service for purchaser credits it had used toward the cost of timber purchases under its other contracts in the Tongass. We agree with ALP in part, but disagree in part.

Under the Contract Disputes Act, 41 U.S.C. § 601–613 (1988), "the decision of the agency board on any question of law shall not be final or conclusive...." Section 609(b). Contract interpretation is a question of law which we review *de novo*. *Triax–Pacific v. Stone*, 958 F.2d 351, 353 (Fed.Cir.1992).

It is undisputed that under the contract, ALP was permitted to use purchaser credits toward the above-base-rate portion of the purchase price of timber under its other contracts in the Tongass, but it was always required to pay at least the base rate portion of the stumpage rate in cash. The parties also do not dispute that under section 4c–2, ALP was required to reimburse the Forest

Service for any purchaser credits that it used which were rendered ineffective by the rate redetermination. The question is what "ineffective under terms of this contract" means in relation to the present case.

■ Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning. *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987). The clear import of section 4c is that a previously used purchaser credit is rendered ineffective "under terms of this contract" when, subsequent to the purchaser's use of the credit, the rates applicable at the time of the use are reduced to base rates such that there no longer is an above-base-rate margin against which to apply the credits. On the other hand, if the credits are applied for a time when stumpage rates exceed base rates, those credits are not rendered ineffective absent some later event, such as a retroactive rate redetermination, reducing those rates to base.

Applying this interpretation to the facts of this case, ALP's liability for cash reimbursement under section 4c–2 turns on the date the base rates resulting from the rate redetermination took effect. ALP requested a rate redetermination in June of 1982, eighteen months into the relevant operating period. The Forest Service granted the request and reduced the current stumpage rate of $86.29/MBF to the base rate of $1.48/MBF, effective July 1, 1982. Therefore, prior to the effective date, ALP was otherwise liable for, but had credits against, a stumpage rate well in excess of the base rate. After the effective date of the rate redetermination, ALP's use of credits was limited because the stumpage rate was the base rate.

The parties stipulated to the amount of purchaser credit that ALP used toward the purchase of timber under other Tongass contracts after January 1, 1981, the beginning of the relevant operating period. Between that date and July 1, 1982, the effective date of the rate redetermination, ALP earned $12,824,631 in purchaser credits and transferred $3,301,274 in credits to pay for above-base-rate charges for timber purchased under other contracts. Between July 1, 1982 and May 6, 1983, the date the rate redetermination

was granted and during which time the redetermined base rates were in effect, ALP earned $4,728,419 in purchaser credits and transferred $2,150,000 in credits to pay for above-base rate charges on timber sales under other contracts.[2] ALP thus properly used $3,301,274 in credits toward the purchase of timber before the new stumpage rates established by the redetermination went into effect, and the Board erred in denying ALP's claim for that amount. On the other hand, the $2,150,000 in credits used following the effective date, when the stumpage rate did not exceed the mandatory base rate, could not properly be credited against the base rate and the Board was correct in denying that portion of ALP's claim.

■ ALP argues that the Forest Service breached section 2d-2 of the contract, which governs the manner in which the Forest Service sets stumpage rates and provides in pertinent part:

> The stumpage rates fixed as a result of such rate redetermination shall **be adjusted by the Forest Service, if necessary so that** at the time made **they are** *equitable* to the Purchaser and competitive in comparison with rates on other sales, primarily of pulp timber involving substantial quantities on the Tongass National Forest.... [Emphasis added.]

According to ALP, "equity" requires that the Forest Service redetermine rates so that ALP is placed in the best possible financial position. Specifically, ALP asserts that the Forest Service should have set rates just high enough above base so that ALP would not have to reimburse the Forest Service for previously used credits. We reject this interpretation. Read in context, that section does not place a burden on the Forest Service to maximize ALP's earnings, as ALP seems to urge, but merely requires the Forest Service to insure that stumpage rates are competitive as compared to other stumpage rates in the Tongass. It does not override the clear limitation on ALP's use of credits found elsewhere in the contract.

The government argues that ALP was required to reimburse the government for all credits used after the beginning of the relevant operating period. According to the government, any other interpretation of section 4c-2 would have permitted ALP to offset base rates and avoid its obligation to construct roads, contrary to the express provisions of the contract. The government argues that the legislative history of the purchaser credit legislation shows that Congress intended that rate redeterminations on one contract render purchaser credits previously transferred to other contracts ineffective.

We reject these arguments. It is undisputed that ALP could not use purchaser credits toward the payment of base rates. What the government fails to explain is how ALP's use of credits prior to the date that the redetermined rates took effect permitted ALP to avoid its obligation to pay base rates and construct necessary roads. The government fails to address the fact that prior to the effective date of the rate redetermination, ALP paid stumpage rates in excess of base rates and used purchaser credits only toward the above-base-rate portion of timber purchases under its other Tongass contracts.

We thus conclude that ALP was not required to reimburse the Forest Service for credits used prior to the date the redetermined base rates took effect. The $3,301,274 in credits that ALP used prior to the effective date of the rate redetermination were not subject to the cash replacement requirement of section 4c-2 and the Board erred in denying that portion of ALP's claim. However, the $2,150,000 in credits that ALP transferred to other contracts after the redetermined base rates took effect were rendered ineffective and subject to the cash replacement requirement. The Board properly denied that part of ALP's claim.

## CONCLUSION

The decision of the Board is affirmed-in-part and reversed-in-part.

---

2. ALP's claim is for $5,613,122.22. The parties stipulated that ALP used $3,301,274 prior to the effective date of the rate redetermination and $2,150,000 after that date, the total of which is $5,451,274, an amount less than that of ALP's claim. The record does not clarify this discrepancy.

## COSTS

No costs.

AFFIRMED–IN–PART AND RE-VERSED–IN–PART.